UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

DARREN MICHAEL SHIELDS ET AL.        CASE NO.  6:19-CV-01359

VERSUS                               JUDGE JAMES D. CAIN, JR.

STATE FARM MUTUAL AUTOMOBILE   MAGISTRATE JUDGE PATRICK J.
INSURANCE CO.                  HANNA

<u>MEMORANDUM RULING</u>

Before the court is a Motion for Class Certification [doc. 82] filed pursuant to

Federal Rule of Civil Procedure 23 by plaintiff Connie Bourque. Defendant State Farm

Mutual Automobile Insurance Company opposes the motion. Doc. 98. The matter came

before the court for a hearing on November 2 and 3, 2021, and the undersigned now issues

this ruling.

I.
BACKGROUND

A. Procedural Background

This lawsuit challenges a valuation system used by car insurers to determine cash

value of vehicles on total loss claims. Darren Shields and Connie Bourque are two

Louisiana residents who had insurance policies through State Farm. Under the terms of

these policies, State Farm agreed to pay the owner the actual cash value ("ACV") of the

insured vehicles upon the occurrence of a total loss. To determine the ACV, State Farm

used a product known as the Autosource Market-Driven Valuation ("Autosource"), which

was developed by a company known as Audatex and allegedly marketed exclusively to insurance companies. Doc. 1, ¶¶ 7–13.

Mr. Shields filed a claim under his collision coverage, after his 2008 Isuzu i-370 LS truck was involved in an accident that occurred on or about April 27, 2019. *Id.* at ¶¶ 7–8, 18. Ms. Bourque also filed a claim under her collision coverage, based on damage sustained to her 2016 Toyota Rav4 XLE in an accident occurring on or about March 7, 2018. *Id.* at ¶¶ 9–10, 21. Both individuals challenge the adjusted value of their vehicles, as determined by the Autosource valuation report, and allege that it resulted in their claims being undervalued compared to values derived from publicly available sources like Kelly Blue Book or NADA Guides. They filed suit in this court on October 16, 2019, invoking the court's jurisdiction under 28 U.S.C. § 1332 and alleging that State Farm's use of Autosource resulted in a breach of the insurance contract as well as violations of Louisiana law. *Id.* at ¶¶ 27–48. They seek certification on behalf of State Farm policyholders who have been similarly undercompensated based on the use of Autosource. *Id.* at ¶¶ 50–59.

On a prior motion for summary judgment, the court dismissed plaintiff Shields's claims on the grounds of judicial estoppel due to his failure to disclose this suit in his bankruptcy proceedings. Doc. 67. The court also denied as premature motions for partial summary judgment brought by State Farm, on plaintiff's bad faith claims and whether NADA values constituted ACV of a vehicle. Doc. 119. The motion for class certification then came before the court for a two-day hearing beginning on November 2, 2021. Docs. 137, 138. Here plaintiff seeks certification under Federal Rule of Civil Procedure 23 of a class defined as:

> **All persons insured by State Farm who have made a claim for first party total loss, which State Farm evaluated using Autosource, or a predecessor product, from January 1, 2017, to the present date.**

Doc. 82, p. 1.

### B. Evidence Adduced at Hearing

#### 1. Testimony of Plaintiff

As described above, Ms. Bourque's claim is premised on the Autosource valuation of her vehicle following an accident in March 2018. The NADA base value for her vehicle was $20,150.00 and the fully adjusted ("clean retail") value was $20,050.00, after adjustments for mileage and options. Doc. 154, att. 19, p. 16. Her Autosource base value was $19,863.00, with an adjusted value of $19,928.00 (she received a positive condition adjustment). *Id.* at 12. State Farm moved for summary judgment on the issue of whether she had compromised her claim, and the court denied the motion due to genuine issues of material fact. Doc. 67. At the hearing Ms. Bourque testified that she understands her responsibility to the class, is willing to put the class's interests above her own, and is prepared to participate in whatever manner is required. Tr., Day 1, p. 58.

#### 2. Autosource Functions

To determine ACV of a totaled vehicle, State Farm typically uses a third-party software. Tr., Day 2, pp. 158, 240. From early 2016 until recently, State Farm used Autosource as its exclusive software platform for these purposes in Louisiana. *Id.* at 158–59. In the first year of using Autosource, and under its prior platform, State Farm's ACV determinations were based on the vehicle's NADA values. *Id.* In 2017, however, State Farm switched to Autosource's "multi-comp" approach, which determines vehicle values

based on comparable vehicle sales and sale listings in the local market area. *Id.* at 160, 272–75.

Autosource's process begins with physical inspection of the damaged vehicle. Tr., Day 2, p. 254. If the vehicle appears to be a total loss, the estimator assigns condition ratings to a number of components such as vehicle interior, paint, and tires. *Id.* at 230–1; Doc. 155, att. 8 (Autosource Total Loss Condition Book). The vehicle is then compared against those in Autosource's database, which is made up of vehicle listings in the local market area from the last 120 days. Tr., Day 2, pp. 256–57. The software searches outward in 25-mile increments from the location of the totaled vehicle until it has located at least ten comparable vehicles ("comps").[1] *Id.*

Autosource then applies certain adjustments to the comps. Because many of the database values represent dealer-advertised prices rather than actual sales, Autosource applies a "typical negotiation adjustment" based on the fact that dealers routinely reduce the price of vehicles in negotiations with would-be car purchasers. *Id.* at 259–60. This adjustment is only applied where there is reason to believe that the advertised price will exceed the vehicle's true value. Accordingly, no negotiation adjustment is made for prices advertised by "no-haggle" dealerships or when the data reflects sold rather than advertised prices. *Id.*; Doc. 155, att. 33, ¶ 24. Autosource reevaluates its negotiation adjustment for accuracy twice a year. Tr., Day 2, pp. 259–60. Adjustments are also made for configuration and mileage, to make the comparable vehicles more similar to the totaled vehicle. *Id.* The

---

[1] If ten comparable vehicles cannot be found, Autosource generates an "exception" report based on a smaller number of vehicles or on dealer opinions about the value of the totaled car. Tr., Day 2, p. 174.

values of the comparable vehicles are then averaged and a final adjustment may be made for condition. *Id.* at 260–63. The condition adjustment compares the totaled vehicle's condition to the typical condition of a vehicle of its age and mileage. *Id.* NADA "clean retail," by contrast, assumes a vehicle in "clean retail condition" with minimal interior defects, high gloss finish and shine, no mechanical defects, and all equipment in complete working order. *Id.* at 270; Doc. 155, att. 39, p. 7.

The output of this process, the Autosource Report, is delivered to State Farm. Tr., Day 2, p. 265. A State Farm representative reviews the report with the insured, who may provide additional information or corrections necessitating adjustments to the report. *Id.* About 70 percent of insureds accept the valuation provided by the Autosource report. *Id.* at 178–79. In the other 30 percent of cases, the insured disagrees with the valuation and State Farm may conduct additional valuation research or obtain an exception report. *Id.* at 174–75. According to a 2015 Autosource evaluation, its methodology results in valuations that are on average higher than the actual sale price in Louisiana. Doc. 155, att. 22.

### 3.  Damages Methodology

State Farm used Autosource to value total losses in Louisiana from January 1, 2017, until October 15, 2021. Tr., Day 2, p. 222. State Farm has admitted that prospective class members' claim-related information, such as claim number, date of loss, vehicle owner, cause of loss, valuation information, actual cash value of the vehicle, the tax paid, deductibles, and the total amount paid for each claim is in its Enterprise Claim Adjustment System (ECS) data base. Doc. 154, att. 35, pp. 16–17. State Farm's corporate representative confirmed this at the hearing. Tr., Day 2, p. 212. Even if it has not already been done, the

information necessary to identify class members is available in a searchable database or obtainable by administrative means using information in computer records. The Autosource Report is in each insured's claim file. *Id.* at 169.

Plaintiff contends that damages can be calculated class-wide from the difference between the ACV payouts under Autosource and "what a lawful system, like NADA, would pay." Doc. 82, att. 1, p. 14. This methodology was approved by the Fifth Circuit in *Slade v. Progressive Security Insurance Company*, 856 F.3d 408 (5th Cir. 2017), a class action based on a car insurance company's use of a different software for valuing total loss claims. An analysis by State Farm expert Holly Sharp of over 50,000 total loss claims in Louisiana, however, shows that more than 50% of their customers received more based on an Autosource valuation than they would have if the ACV of their totaled vehicle was determined based on NADA clean retail. Tr., Day 2, pp. 305–09; Doc. 155, atts. 34 & 36.

Plaintiff's accounting expert, Lisa Zakowicz, testified that the methodology was also a good fit for Autosource claims and that she could compile the data and manipulate it as required, including removal of the claims where the Autosource valuation exceeded NADA. Tr., Day 1, pp. 94–117. At the hearing it was revealed that up to 18 months of additional claims data exist that have been "anonymized" by Autosource in accordance with its contract with State Farm. Tr., Day 2, pp. 291, 299–301. The insured's information is still available but will have to be manually pulled from each Autosource report. Tr., Day 1, pp. 131–32. Ms. Zakowicz's methodology, however, assumes that the Autosource value reflects the amount actually paid to the insurer. It does not take into account the estimated 30 percent of users who disputed the Autosource valuation and may have been paid a

different amount. The amount paid to those individuals is recorded in claim notes, also requiring a file-by-file review. Tr., Day 2, pp. 185–86.

## II.
### CLASS CERTIFICATION STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *California v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). The party seeking class certification bears the burden of establishing that it is appropriate under the requirements of Federal Rule of Civil Procedure 23, by a preponderance of the evidence. *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737–38 (5th Cir. 2003). To this end the district court must "conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class." *Id.* (internal quotations omitted) At issue here are the four requirements set forth under Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) as well as Rule 23(b)(3)'s requirement that common questions predominate over individual ones.

## III.
### LAW & APPLICATION

### A. Plaintiff's Claims

Class determinations "[f]requently . . . entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Here plaintiff seeks certification on two claims: breach of insurance contract and penalties under Louisiana Revised Statute § 22:1973. Both claims relate to the provisions of

Louisiana Revised Statute § 22:1892 outlining acceptable methods for calculating actual

cash value of a totaled vehicle:

> When an insurance policy provides for the adjustment and settlement of first-party motor vehicle total losses on the basis of actual cash value or replacement with another of like kind and quality, and the insurer elects a cash settlement based on the actual cost to purchase a comparable motor vehicle, such costs shall be derived by using one of the following:
>
> > (a) A fair market value survey conducted using qualified retail automobile dealers in the local market area as resources. If there are no dealers in the local market area, the nearest reasonable market can be used.
> >
> > (b) The retail cost as determined from a generally recognized used motor vehicle industry source; such as, an electronic database, if the valuation documents generated by the database are provided to the first-party claimant, or a guidebook that is available to the general public. If the insured demonstrates, by presenting two independent appraisals, based on measurable and discernable factors, including the vehicle's preloss condition, that the vehicle would have a higher cash value in the local market area than the value reflected in the source's database or the guidebook, the local market value shall be used in determining the actual cash value.
> >
> > (c) A qualified expert appraiser selected and agreed upon by the insured and insurer. The appraiser shall produce a written nonbinding appraisal establishing the actual cash value of the vehicle's preloss condition.
> >
> > (d) For the purposes of this Paragraph, local market area shall mean a reasonable distance surrounding the area where a motor vehicle is principally garaged, or the usual location of the motor vehicle covered by the policy.

La. Rev. Stat. 22:1892(B)(5). Additionally, Louisiana Revised Statute 22:1973 imposes on

insurers a duty of good faith and fair dealing with a penalty "in an amount not to exceed

two times the damages sustained or five thousand dollars, whichever is greater." La. Rev.

Stat. § 22:1973(A), (C). It outlines several acts that, "if knowingly committed or performed

by an insurer," constitute a breach of this duty. *Id.* at § 22:1973(B). These include "[f]ailing

to pay the amount of any claim due . . . within sixty days after receipt of satisfactory proof

of loss from the claimant when such failure is arbitrary, capricious, or without probable cause." *Id.* at § 22:1973(B)(5).

Plaintiff alleges that total loss payments calculated by Autosource do not come from "[a] fair market value survey conducted using qualified retail automobile dealers in the local market area as resources" as required by § 22:1892(B)(5)(a). The initial search for comparables is limited to a 25-mile radius, expanding concentrically until the requisite number of comparable vehicles are found, but plaintiff contends that this does not satisfy the statute. The statute requires that "qualified retail automobile dealers in the local market area" be used as "resources" to determine a fair value for the totaled vehicles. Under the plain language of the statute, according to plaintiff, the survey is supposed to be of "qualified retail automobile dealers in the local market area." Plaintiff asserts that this reading makes sense because such dealers would have the most pertinent opinions on values in the local market area. Plaintiff also alleges that Autosource's preliminary first step of identifying comparables is not what drives the ultimate values that are derived; the various proprietary algorithms that drive adjustments for the selling price adjustment, mileage, condition, and options are based on nonlocal data, completely unrelated to the comparables found in the first survey.

Plaintiff also alleges that the Autosource system violates § 22:1892(B)(5)(b) because it does not provide the "retail cost as determined from a generally recognized used motor vehicle industry source; such as, an electronic database, if the valuation documents generated by the database are provided to the first-party claimant, or a guidebook that is available to the general public." Autosource's corporate representative testified that while

NADA is a guidebook, Autosource is "a product that provides valuations to our clients."[2] Doc. 82, att. 3, pp. 63–64. Plaintiff alleges that Autosource is not a "generally recognized used motor vehicle industry source" either, since only insurers or their agents use and otherwise have access to this program. *See id.* at 65. Consumers cannot use it because they have no access to it as it would too expensive. Tr., Day 2, p. 241. Autosource valuations are prepared for the insurance companies, not the consumers. Doc. 82, att. 3, p. 65.

Plaintiff also maintains that, even assuming that Autosource is a "generally recognized used motor vehicle industry source," "the valuation documents generated by the database" are not "provided to the first party claimant" since the final report is only given to the insured when requested. Doc. 82, att. 2, pp. 53–54. Even when the Autosource Report is provided to State Farm insureds, plaintiff showed, the basis for the selling price adjustments, and the other proprietary data and algorithms about mileage, options, and condition adjustments, are not provided. Such data would only be provided to Autosource's "customer" (the insurance company). Tr., Day 2, p. 284.

Plaintiff also alleges that even if the base price determined by Autosource complies with the statute, any negative conditioning adjustment violates the law. Louisiana Revised Statute § 22:1892(B)(5)(b) requires an insurance company to pay its insured "[t]he retail cost as determined from a generally recognized used motor vehicle industry source . . . ." This section of the statute continues, "[i]f the insured demonstrates, by presenting two independent appraisals, based on measurable and discernable factors, including the

---

[2] Autosource marketing materials also contrast it with guidebooks: "Autosource is focused on the insurance industry" while "[g]uidebooks are primarily used for vehicle loan financing by banks and dealership purchasing of trade-ins during the sales process." Doc. 154, att. 3, p. 63.

vehicle's preloss condition, that the vehicle would have a higher cash value in the local market area than the value reflected in the source's database or the guidebook, the local market value shall be used in determining the actual cash value." Plaintiff reads the statute as establishing the floor, not the ceiling, when a generally recognized used motor vehicle industry source is used to establish retail value. According to plaintiff, the statute grants the insured—and the insured only—the ability to present additional evidence as to why his or her particular vehicle had a higher value than what the generally recognized used motor vehicle industry source (like NADA) determined.

Plaintiff asserts that State Farm's violation of § 22:1892B(5) (if found) is also a breach of State Farm's insurance contract with each class member. State Farm's policy states that the coverage is provided "in accordance with Louisiana insurance law. If any provisions of this policy are in conflict with Louisiana statutes, the policy is amended to conform to the minimum requirements of the statutes." Doc. 154, att. 18, p. 41.

In sum, plaintiff alleges that State Farm had a duty to comply with Louisiana law, in this case Louisiana Revised Statute § 22:1892B(5), when it valued total loss vehicles for its insureds in Louisiana. Plaintiff alleges that State Farm's use of Autosource violates § 22:1892B(5) and thus its contract with its insureds because it is neither a generally recognized used motor vehicle industry source nor a fair market value survey using local automobile dealers as resources. Plaintiff alleges that this breach of the insurance contract gives rise to a claim for penalties under § 22:1973 for all class members, regardless of the amount State Farm paid for those insureds' total losses.

11

### B.  Commonality and Predominance

State Farm offers no argument in opposition to plaintiff's contention that the numerosity requirement is satisfied. The court concludes that it is based on both the number of total loss claims and the number that received less under Autosource than they would have under NADA, *infra*. The court's analysis therefore begins with Rule 23's related concepts of commonality and predominance.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." For class actions seeking money damages, Rule 23(b)(3) also requires that these questions "predominate over any questions affecting only induvial members," effectively superseding the commonality requirement with a "far more demanding" standard. *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)). The predominance element requires the court to consider "how a trial on the merits would be conducted if a class were certified," including "identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class." *Madison v. Chalmette Refining, LLC*, 637 F.3d 551, 555 (5th Cir. 2011) (internal quotations omitted). The goal of this process is to "prevent[] the class from degenerating into a series of individual trials." *Id.*

As the Fifth Circuit recently emphasized, a need to calculate damages on an individual basis will not necessarily preclude class certification. *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 710–11 (5th Cir. 2020). The issue turns on whether the damages of each plaintiff can be determined by mathematical or formulaic calculation. *Id.*

12

Where the claims "focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential that the class action may degenerate in practice into multiple lawsuits separately tried renders class treatment inappropriate." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) (cleaned up).

Plaintiff argues that there is common evidence of class-wide injury in this matter because (1) every member of the putative class suffered a concrete harm regardless of whether they were underpaid, and (2) there is common evidence of class-wide injury because Ms. Zakowicz can identify every putative class member who received an Autosource valuation that was less than the NADA valuation for the total loss. State Farm maintains that, under the Supreme Court's recent decision in *TransUnion LLC v. Ramirez*, __ U.S. ___, 141 S.Ct. 2190 (2021), any member who was not underpaid by Autosource lacks standing and that individual issues also predominate as to the putative class members who were underpaid.

In *Ramirez*, the Supreme Court considered a jury verdict for statutory penalties and damages for a Rule 23(b) class of over eight thousand consumers bringing suit under the Fair Credit Reporting Act . The class members had all received alerts on their credit reports because they were a potential match to a name on a list of terrorists, drug traffickers, and other serious criminals on a list maintained by the Office of Foreign Assets Control, and they alleged that the agency failed to exercise reasonable care in maintaining this list. However, less than twenty-five percent of the class could show a concrete harm (the dissemination of misleading credit reports to third party creditors). Emphasizing that Article III standing requires "a concrete injury even in the context of a statutory violation"

and that "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions," the Court held that the members bringing suit only for statutory penalties lacked such standing. *Ramirez*, 141 S.Ct. at 2205 (internal quotations omitted).

As plaintiff notes, *Ramirez* was decided after a trial on the merits. The Court specified that it was not addressing "the distinct question of whether every class member must demonstrate standing *before* a court certifies a class." 141 S.Ct. at 2208 n. 4. This court is also mindful that an inability to show damages does not always translate to a lack of standing. *See Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 377 (8th Cir. 2018) ("[W]hether some Plaintiffs are unable to prove damages because they eventually recouped . . . payment is a merits question, and the district court has the power to amend the class definition at any time before the judgment.") At the same time, *Ramirez* remains clear in its pronouncements on standing. In this matter the proposed class members who were not underpaid under plaintiff's damages model are readily ascertainable; the court can see little point in including them in a class definition if they have no claim for recovery.

Louisiana law does not provide a statutory penalty for a violation of Louisiana Revised Statute § 22:1892(B)(5), based on either the plain language of the penalty statutes or any Louisiana jurisprudence located by this court. The question, then, is whether plaintiffs in this matter may establish standing based on the insurer's alleged violation of the penalty statutes, which punish the insurer's bad faith handling of a claim, without any

14

associated economic harm. As a matter of first impression, the court determines that they cannot.[3]

When determining whether an intangible harm may provide standing, the court should look to whether the harm has "a close relationship to a harm that has traditionally been recognized as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). The legislature's intent is "instructive and important," but its "role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* "Concrete injuries embrace not only tangible harms — like a picked pocket or a broken leg — but also intangible ones, like the suppression of free speech or religious exercise, or the invasion of a common-law right (including a right conferred by contract) actionable without wallet injury." *Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 330–31 (1st Cir. 2020) (cleaned up).

Plaintiff argues that the intangible harm resulting from an insured's breach of its fiduciary duty provides the concrete injury necessary to establish standing in this matter. Generally, however, a tort claim based on breach of a fiduciary duty requires the plaintiff to show a resulting harm. *Amrhein*, 954 F.3d at 334 (citing Restatement (Second) of Torts § 874 (1979)); *see also Erickson v. AmeriCold Logistics LLC*, 311 F.Supp.3d 1073, 1076–77 (D. Minn. 2016) (union trustees lacked standing to bring breach of fiduciary duty claims

---

[3] Though the Louisiana Supreme Court held in *Sultana Corporation v. Jewelers Mutual Insurance Company*, 860 So.2d 1112 (La. 2003), that proof of actual damages is not a prerequisite to recovery under the predecessor to Louisiana Revised Statute § 22:1973, that case was a simple question of statutory interpretation rather than standing.

against employers over pension fund, when they could not show actual injury to plan or its participants). Here there is no actual or threatened injury to the prospective plaintiffs who received a greater ACV determination under Autosource than they would have under NADA. Whatever the intent of the Louisiana legislature, the court finds that a bad faith claim with no other harm to plaintiff (underpayment, delay, et cetera) alleged as a result does not provide standing to sue in federal court.

The court may, however, "construe the complaint or redefine the class" if it finds plaintiff's proposed class definition unacceptable. *See Beal v. Midlothian Indep. Sch. Dist.*, 2002 WL 1033085, at \*4 (N.D. Tex. May 21, 2002) (quoting 7A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1759, at 111–12 (1986)). It will do so in this matter, drawing on plaintiff's proposal to redefine the class as:

> **All persons insured by State Farm in Louisiana who have made a claim for first party total loss, which State Farm evaluated using Autosource, or a predecessor product, from January 1, 2017, to October 15, 2021, and whose Autosource Base Value was less than the NADA Fully Adjusted Value ("Clean Retail").**

State Farm argues against such a redefinition, pointing to concerns of ascertainability and the rule in some other circuits against "fail-safe" classes. *See, e.g.*, *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1276-77 (11th Cir. 2019) (defining a class to include only injured members "would run the risk of promoting so-called 'fail-safe' classes, whose membership can only be determined after the entire case has been litigated and the court can determine who actually suffered an injury"). Defendants in other matters have also urged such a rule in this circuit, arguing that these definitions are "hopelessly circular" and that because membership was contingent on the ultimate issue of causation,

the claimants are not objectively identifiable. *In re Rodriguez*, 695 F.3d 360, 369–70 (5th Cir. 2012) (collecting cases). The Fifth Circuit has rejected a bright-line rule, however. *Id.* State Farm notes that most of the approved "fail-safe classes" have arisen in the injunctive relief context under Rule 23(b)(2), where ascertainability is of less concern and the focus is on "common behavior by the defendant toward the class." *Yates v. Collier*, 868 F.3d 354, 367 (5th Cir. 2017). However, in *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999), the circuit court upheld certification of a Rule 23(b) damages class of riverboat casino employees whose respiratory illnesses were "caused by or exacerbated by" the vessel's defective ventilation system. The court also addressed defendant's fail-safe concerns, reiterating its holding from *Forbush v. J.C. Penney Co.*, 994 F.2d 1101 (1993) that these arguments were "meritless and, if accepted, would preclude certification of just about any class of persons alleging injury from a particular action." *Id.* at 624 n. 1.

In this matter, the proposed definition here presents an objectively identifiable group of plaintiffs. It does not require a premature determination on the merits— Autosource's compliance with Louisiana law and State Farm's compliance under the contract claim remain open issues, as do State Farm's potential defenses—but instead disposes of the plaintiffs who would have no standing. Accordingly, the court modifies the class definition over defendant's objections.

As for the damages model and common evidence, the court agrees that NADA is not **required** for a determination of ACV under Louisiana law. However, it is one lawful method of determining ACV under Louisiana Revised Statute 22:1892(B)(5). The difference between a lawful measure, such as NADA, and the Autosource-derived ACV

provides an appropriate measure for determining who might have suffered economic harm as a result of State Farm's allegedly improper use of Autosource and even a baseline for calculating their damages. The individuals who received more based on an Autosource-derived ACV than they would have under NADA would have no claim for damages arising from an underpayment and could be excluded. The thirty percent of plaintiffs who contested their Autosource valuation in some measure present a greater challenge to determining damages. As Ms. Zakowicz testified, however, the amount accepted by these individuals can still be determined from State Farm's files. Whether any of these individuals wound up accepting more than the NADA valuation of their vehicles can be determined by simple mathematical calculation.

State Farm also asserts that its affirmative defense of compromise presents individualized inquiries that defeat the predominance requirement. It notes that the court denied summary judgment on the issue of compromise for Ms. Bourque's claim, because there was a fact issue on the parties' mutual consent. It further notes Ms. Bourque's testimony at the certification hearing that she "didn't know she had agreed to [the Autosource ACV determination]." Tr., Day 1, p. 57. State Farm argues that these facts will necessarily differ among putative class members, requiring a review of each claim file, correspondence between the insured and State Farm, and perhaps the insured's testimony. It also argues that plaintiff's counterargument, that these communications were not an offer of compromise but an unconditional *McDill* tender[4], require further individualized proof

---

[4] The Louisiana Supreme Court holds that, "[w]hile an insurer need not tender payment for amounts that are reasonably in dispute . . . there can be no good reason  . . . for withholding an undisputed amount." *La. Bag Co., Inc. v. Audubon Indem. Co.*, 999 So.2d 1104, 1114 (La. 2008) (cleaned up). "Where there is a substantial, reasonable and legitimate

of whether the valuation was disputed at the time of the offer. As the court stated in its summary judgment ruling, this is a prerequisite for a *McDill* tender under Louisiana law. *See La. Bag Co., Inc. v. Audubon Indem. Co.*, 999 So.2d 1104, 1115–16 (La. 2008).

In the summary judgment ruling, the undersigned determined that State Farm's documents were insufficient to establish a party's acceptance of the ACV determination and release of claims against State Farm. Doc. 67. The court continued:

> While either plaintiff might have gained a greater understanding of State Farm's intent through their phone calls, the deposition testimony shows at most that both plaintiffs understood that they could contest the ACV determination with State Farm but decided not to—not that they understood that they would forfeit their right to do so by executing the [Special Limited Power of Attorney]. Accordingly, there is insufficient evidence of the parties' mutual consent to compromise and summary judgment must be denied on this issue.

*Id.* at 9.[5]

"Predominance requires a qualitative assessment; it is not bean counting." *Toney v. Qual. Res., Inc.*, 323 F.R.D. 567, 586 (N.D. Ill. 2018) (quoting *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013)). Affirmative defenses are relevant to the court's predominance inquiry under Rule 23(b)(3), and the predominance of individual issues under such a defense may defeat certification. *E.g.*, *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008). At the same time, affirmative defenses are often easy to resolve and district courts have several tools for managing them. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1240–41 (11th Cir. 2016). Accordingly, when "one or more

---

dispute as to the extent or amount of the loss, the insurer can avoid the imposition of penalties *only* by unconditionally tendering the undisputed portion of the claim." *Id.* (citing *McDill v. Utica Mut. Ins. Co.*, 475 So.2d 1085, 1091 (La. 1985)) (emphasis in original). This is known as a *McDill* tender.

[5] The reference to "parties" is due to the fact that the motion was also brought against former plaintiff Shields.

of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453–54 (2016) (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005)).

At least in Ms. Bourque's case, and likely in several others, the compromise defense cannot be decided on summary judgment because it involves questions of credibility. Still, these questions are narrow at present and based largely on State Farm's speculation regarding the merits of its defense across the pool of potential class members. State Farm can test the viability of this defense as to each plaintiff through limited discovery and can attempt decertification if it uncovers greater evidence of variation or summary judgment against a sub-class if it finds greater documentary proof of compromise. The availability of the defense, however, is not enough for the court to determine that it overrides the common issues of liability on all claims[6] and injury in the redefined class.

### C. Typicality and Adequacy

Under Rule 23(a)(3), the named representative's claims must be typical of those of the class. This requirement is not demanding and "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen*, 186 F.3d at 625. "When the claims permeate from a similar course

---

[6] State Farm asserts that the bad faith claim will also present an individualized inquiry. The court disagrees, observing that the evidence presented so far shows a relatively uniform usage of the Autosource program and that bad faith will depend on a showing that this usage was arbitrary and capricious.

of conduct or transaction and share the same legal theory, factual differences will not defeat typicality." *Chauvin v. Chevron Oronite Co., LLC*, 263 F.R.D. 364, 369 (E.D. La. 2009). Relatedly, the named plaintiff must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between the named parties and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625. In the Fifth Circuit, adequacy encompasses three separate but related inquiries: (1) "the zeal and competence of the representative[s'] counsel;" (2) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees;" and (3) the risk of "conflicts of interest between the named plaintiffs and the class they seek to represent." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005) (quoting *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 479–80 (5th Cir. 2001)).

State Farm raises no challenge to the adequacy of Ms. Bourque's counsel. The court finds that they are competent to proceed in this matter by virtue of their performance to date and their experience in similar matters. Instead, State Farm focuses on the existence of an intra-class conflict because plaintiff's proposed damages methodology is detrimental to more than half of the putative class members she seeks to represent. The court's revision of the class definition, however, disposes of this concern. Ms. Bourque's claims arising from her alleged underpayment through Autosource appear typical of other putative members under the revised definition, and she has shown herself willing to participate as class representative. Accordingly, these factors do not present a bar to certification.

**D. Superiority**

Under Rule 23, the court is also required to find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This inquiry is fact-specific and depends on the circumstances of each case. *Ibe v. Jones*, 836 F.3d 516, 529 (5th Cir. 2016). The court looks to the following factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

The differences between Autosource and NADA valuations are not enough to justify the cost of litigation in many if not all of these cases, resulting in a negative value claim. "The existence of a negative value claim is the 'most compelling rationale for finding superiority.'" *Slade v. Progressive Sec. Ins. Co.*, 2014 WL 6484588, at *9 (W.D. La. Oct. 31, 2014) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996)). Neither party points to any other litigation covering these potential class members, and the court cannot find an adequate interest in their individual control of the litigation given the relatively low value of each claim. This forum represents a desirable one for the litigation by reason of its easy accessibility within the state were most of the claimants will still be located. Finally, for the reasons set forth in the predominance section, management of a class in this matter may prove difficult when it comes to certain affirmative defenses.

However, these issues do not predominate over the common evidence and issues of law regarding liability and damages. Accordingly, the superiority factor is satisfied.

## IV.
### CONCLUSION

For the reasons stated above, the Motion for Class Certification [doc. 82] is hereby **GRANTED**. The parties are **ORDERED** to meet and confer within ten days of this ruling, to agree on a method for exchanging identifying information of potential plaintiffs so that notice can be distributed to the class as defined above. The parties are further **ORDERED** to file a status report within 21 days of this ruling outlining those agreements and identifying any areas of disagreement. Plaintiff is to propose a notice plan within 30 days of this ruling for consideration by the court.

**THUS DONE AND SIGNED** in Chambers on this 3rd day of January, 2022.

JAMES D. CAIN, JR.
**UNITED STATES DISTRICT JUDGE**